## Burton, et al. v. American Bonding & Trust Company.

(Decided December 20, 1918.)

### Appeal from Boyd Circuit Court.

1. Equity—Mistake.—A mistake exists when a person, under some erroneous conviction of law or fact, does, or omits to do, some act, which but for the erroneous conviction he would not have done, or omitted; and it may arise either from unconsciousness, ignorance, forgetfulness, imposition or misplaced confidence.

2. Equity—Failure of Writing to Express Agreement.—That a mistake in failing to have a writing express the agreement of the parties may be corrected, is universally admitted. And, the gen-

eral rule that an admitted or clearly established misapprehension of the signer, as to the legal effect of an instrument, creates a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and most flagrant cases, is equally well established.

3.   Equity—Correction of Contract.—Where the parties to a contract signed it under a mutual misapprehension as to its legal effect, equity will correct it to make it conform to the agreement of the parties.

HAGER & STEWART for appellant.

GEORGE B. MARTIN and JOHN L. SMITH for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This appeal is prosecuted to reverse a judgment of the Boyd circuit court holding the appellants, Burton and Burns, liable to contribute an amount equal to one-third of the amount defaulted by L. D. Boggs as sheriff of Lawrence county. There is no dispute respecting the amounts found by the judgment appealed from. The parties agree that the appellee and the United States Fidelity & Guaranty Company paid $2,550.18 as the sum of the amounts defaulted by Boggs as sheriff prior to the year 1900, and that if there is any liability on the part of the appellants for these defaulted amounts they are liable for one-third thereof, less certain credits. Upon a former appeal this court held that the petition stated a cause of action. American Bonding & Trust Co. v. Burton, 30 Ky. L. R. 703, 99 S. W. 654.

The record shows that L. D. Boggs was elected sheriff of Lawrence county in November, 1897, for a term of four years, beginning January 1st, 1898. On December 27th, 1897, he executed (1) his official bond required by section 4556 of the Kentucky Statutes; (2) his state revenue bond required by section 4133 of the Kentucky Statutes, and (3) his bond for the county levy required by section 1884 of the Kentucky Statutes. The United States Fidelity & Guaranty Company was the surety on each of these bonds for the year 1898.

On December 27th, 1898, he executed three similar bonds for the year 1899, with the United States Fidelity & Guaranty Company as surety. Up to this time the United States Fidelity & Guaranty Company had been the sole surety on all of Boggs' bonds as sheriff. On December 27th, 1899, Boggs executed his revenue bond

and his official bond for 1900, and on April 16th, 1900, he executed his county levy bond for that year. These three bonds for the year 1900 were signed by the appellee, the American Bonding & Trust Company, as sole surety.

·For brevity it will hereinafter be called the bonding company.

The appellee having learned in the following October that Boggs had not accounted for all of the taxes collected by him during 1900, it sent Howard Abrahams, its assistant secretary-treasurer, to Louisa, Ky., for the purpose of checking up Boggs' accounts. From this examination Abrahams ascertained that about $800.00 of the tax collections made by Boggs for the year 1900 had not been turned over to the proper official. Of this sum about $200.00 was in bank, and Boggs had a receipt for about $300.00 for special disbursements, for which he was entitled to a credit. To these sums he added a sum sufficient to make up the full amount due the county, and a settlement was made with the proper official for the revenue collections for the year 1900, up to that date.

The question then arose as to who should collect the uncollected portion of the taxes for that year. Abrahams was unwilling that Boggs should make the collections and threatened to take steps to have the bonding company withdrawn as surety upon his bond unless some other satisfactory arrangement should be made. On the other hand Boggs was reluctant to give up his office, or to be removed therefrom for a failure to give the required bonds. At this juncture Sullivan, who then represented the appellee at Louisa, suggested that M. C. Burns, a responsible man, who sometimes acted as surety for compensation, might be induced to stand surety for Boggs. But this Burns positively refused to do. It was finally arranged that S. H. Burton, a reliable man, who was then acting as deputy sheriff for Boggs, should undertake to collect the unpaid portion of the taxes for 1900: that Boggs would permit him to do so without interference; that Burns, in consideration of the sum of $100.00. to be paid him by the appellee bonding company, would indemnify it against any loss by reason of its suretyship for Boggs, and that the bonding company would remain surety on Boggs' official bonds for the year 1900, and would not take any steps to secure release from any of said bonds except for good and sufficient cause occurring

on or after that date.    This gentlemen's tripartite agreement was reduced to writing on October 1st, 1900, and was executed in triplicate by Boggs, Burton and Abrahams as assistant secretary-treasurer of the bonding company.    On the same day Boggs and Burton signed the following agreement:

"Louisa, Ky., October 1st, 1900.

"This agreement, made and entered into this day by and between S. H. Burton and L. D. Boggs, is conditioned as follows:

"L. D. Boggs, being sheriff of Lawrence county, and desiring the said Burton to act as deputy and to collect taxes and to do any other duty required of a sheriff, agrees to pay said Burton $468.00 on final settlement between them for the year 1900.    In consideration of this sum Burton agrees to pay said Boggs one-half of the commission received for collecting the taxes for 1900, and to give said Boggs one-half of the fees collected by virtue of his deputyship.    Burton is to have the exclusive right to collect all the county and state taxes uncollected for the year 1900; and the said Boggs is not, by himself, agent, or deputy, to collect any taxes whatsoever.    There has been an examination of the books for said year of 1900 and the amount of taxes collected to this date has been ascertained, but should it occur that any tax has been collected by said Boggs or H. C. Evans (deputy sheriff) on the sheriff's book, then to this extent Boggs is to repay said sum on final settlement.    The said Burton is to execute all papers and serve all processes of courts directed to the sheriff.

"L. D. Boggs, S. L. C.
"S. H. Burton."

In carrying out Burns' part of the gentlemen's agreement, Burns and Burton, on October 27, 1900, executed and delivered to appellee the following paper:

"State of Kentucky,
    Lawrence county.

"Know all men by these presents: That we, S. H. Burton and M. S. Burns, of Lawrence county, Kentucky, in consideration of the sum of one hundred dollars ($100.00), the receipt whereof is hereby acknowledged, do hereby undertake to indemnify the American Bonding & Trust Company, of Baltimore City, its successors or

assigns, from and against any loss by reason of it, the American Bonding & Trust Company having heretofore signed the official county levy and state revenue bonds of L. D. Boggs, sheriff of Lawrence county, Kentucky, aforesaid, on Decr. 27th, 1899, and April 16th, 1900.

"S. H. BURTON,

"M. S. BURNS."

Burton performed his contract by collecting and fully accounting for the remaining portion of the taxes for 1900; and the bonding company executed its agreement by paying Burns a fee of $100.00 for his obligation as surety for Burton, and by remaining as surety upon the bonds of Boggs.

It subsequently developed, however, that Boggs had defaulted in his tax collections during the previous years 1898 and 1899 in the sum of $2,550.18, for which amount the county of Lawrence obtained a judgment against Boggs and the United States Fidelity & Guaranty Company, the surety upon the bonds for those two years. The United States Fidelity & Guaranty Company, as surety, paid the judgment, and thereupon demanded contribution of the American Bonding & Trust Company, as co-surety, to the extent of one-third, or $850.05, by reason of its having signed the bonds of Boggs as sheriff for the year 1900.

Section 4134 of the Kentucky Statutes makes the sureties of all bonds executed by the sheriff jointly and severally liable for any default of the sheriff during the term in which the bond may have been executed, "whether the liability accrued before or after the execution of such bond or bonds." This statute was upheld in Howard v. Commonwealth, 105 Ky. 604. See also Whaley v. Commonwealth, 110 Ky. 154.

Recognizing its liability under the statute, the American Bonding & Trust Company paid the United States Fidelity & Guaranty Company the sum of $850.06 in full settlement and discharge of its claim for a contribution; and the American Bonding & Trust Company in turn demanded of Burns and Burton that they reimburse it under their indemnifying agreement of October 29th, 1900, above set out. Upon their failure to respond the bonding company instituted this action in the Boyd circuit court. By way of answer Burton and Burns alleged that the agreement by which they undertook to indem-

nify the bonding company against any loss by reason of its suretyship for Boggs, was limited in its operation to tax collections for the year 1900; and, that if the bond should be construed otherwise so as to hold them liable as indemnitors for breaches of the bonds for 1898 and 1899, it was so written through mistake; and they asked that it be corrected to conform to the agreement, and that they be exonerated from all liability.

Without stating the grounds for its action, the circuit court gave judgment for the bonding company, and Burns and Burton appeal.

Unquestionably, by the terms of their agreement of October 29th, 1900, above set out, Burton and Burns undertook to indemnify the bonding company against any loss by reason of its suretyship on the bonds of Boggs as sheriff; and, as heretofore stated, the bonding company was unquestionably liable for the breaches of Boggs' bond as sheriff for the preceding years 1898 and 1899, although it was not named as surety for those years. Therefore, according to the strict letter of the bond as written, the appellants were liable, and the judgment appealed from is correct.

But, was it so written through mistake? And, if so, in what respect was there a mistake made?

A mistake exists when a person, under some erroneous conviction of law or fact does, or omits to do, some act which but for the erroneous conviction he would not have done, or omitted. Haynes's Outlines of Equity, 132. It may arise either from unconsciousness, ignorance, forgetfulness, imposition, or misplaced confidence. Where the mistake arises from imposition or misplaced confidence, relief may be had on the ground of fraud. Where it arises from unconsciousness, ignorance, or forgetfulness, no element of fraud exists, and redress must be obtained, if obtained at all, on the distinct equitable ground of mistake. Bispham's Eq., sec. 185. As there is no claim of imposition upon the part of any of the parties, the mistake asserted must have arisen, if at all, from ignorance or carelessness in signing a bond having a legal effect different from what it was supposed to have, or from carelessly failing to have the written memorial express the agreement made.

It is clear from the proof that both mistakes may be said to have been made in this instance since none of the parties thought Burns and Burton were signing an agree-

ment to indemnify the bonding company for Boggs' defaults of 1898 or 1899, and, if they had known that the legal effect of the agreement of October 29th, 1900, was to hold Burns and Burton, it would have been changed so as to guard against any such liability. That a mistake in failing to have the writing express the agreement may be corrected, is universally admitted; and, the general rule that an admitted or clearly established misapprehension of the signer as to the legal effect of an instrument creates a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is equally well established. Story's Eq., sec. 110.

The rule last above mentioned, is well illustrated by the leading case of Griswold v. Hazard, 141 U. S. 260, 284. In that case, Durant, a resident of New York, was arrested at the suit of Hazard under a writ of *ne exeat* while temporarily at Newport, R. I. To obtain his release Griswold signed Durant's bond as surety conditioned that Durant should perform the judgment of the Rhode Island court, from which the writ was issued. Fourteen years afterward a judgment was entered for a large sum; and Durant having failed to pay it, Hazard sued Griswold, at law, upon the bond. Griswold filed his bill in equity to restrain the proceedings at law, alleging that he had intended to sign, and believed, at the time, that he had signed a bond which simply bound him for the *appearance* of Durant, and that its execution in its actual form was the result of mistake. The court held that, the mistake being clearly established, Griswold was, under the circumstances, entitled to relief against the mistake, and that the action on the bond should be enjoined.

An examination of the proof in this case brings it within the rule above announced.

Abrahams, Burns, Burton and Sullivan are the only witnesses, and from their testimony it clearly appears that none of them then knew that the bonding company, in signing the sheriff's bond for 1900, made itself liable for the breaches of the previous bonds of the sheriff. Burns, Burton and Sullivan testified to that effect, and Abrahams was not questioned upon that subject. Furthermore, it seems equally clear that all parties acted upon the assumption that the appellee would be liable only for the taxes for the year 1900. Abrahams con-

fined his examination to the tax collections for that year, and the arrangements which they made for Burton to collect the unpaid taxes for that year, showed that unmistakably. And the indemnifying bond is not inconsistent with that understanding since it is in simple and plain terms that any lawyer would use under the circumstances, and merely indemnifies the bonding company against any loss by reason of its surety under the bonds of "December 27th, 1899, and April 16th, 1900." If the parties interested had suspected that the effect of the bonds for 1900 would be to hold the suretyship liable for breaches by the sheriff in previous years, certainly some mention would have been made of that fact.

Burton and Burns both testified that the purpose of the arrangement was to secure the collection of the taxes for 1900, while Abrahams merely says that the agreement was to protect the bonding company from loss by reason of having signed Boggs' bond as shown by its terms. Burns further testified that Abrahams said he was afraid that Boggs would collect the taxes for 1900 and apply them on previous years, and for that reason it was a desirable thing not to put the 1900 taxes in his hands. When asked if he had made such a statement to Burns or in his presence, Abrahams said:

"I didn't know that Mr. Boggs was in arrears for revenue collected for years previous to 1900. There were rumors to the effect that Boggs was short, but I made no investigation and had no knowledge as to the collections for previous years.

"I do not recollect having been in conversation with Mr. Burns, or in his presence, expressing a fear that Boggs would collect the taxes for the year 1900 and apply them to the years back of that in which he was in arrears. Boggs never admitted to me that he was in arrears in any year. I did say to several that the 1900 collections must be safeguarded, and if he were in arrears for previous years, that the collections for which we were responsible would not be applied to such arrearages.

"I have no recollection of any conversation with Mr. Burns, during which he told me that Boggs was in arrears in a considerable sum for previous years. He did decline to sign an indemnity agreement for Boggs, but that was predicated, as I recall, on Boggs' continuing to make the collections for 1900."

And, when further questioned whether, at any time, there had been any discussion between himself and Burton and Burns as to the effect of the indemnity contract, or the extent of possible liability thereunder, Abrahams answered: "None that I recall, other than that the agreement was to protect the bonding company from loss by reason of having signed Boggs' bond."

It will be observed that the effect of this testimony is that while Abrahams, like the others, was not aware that the legal effect of the sheriff's bond was to hold the surety liable for defaults in the previous years, but that he knew that Boggs was in arrears for the previous years, and was afraid that Boggs might apply the collections for the year 1900 to make up the deficiencies for the previous years; and to guard against that possibility he stipulated that Burton, and not Boggs, should collect the unpaid taxes. Burns further testified that he would not, under any conditions, have signed the indemnifying bond if he had thought it obligated him for any shortage of Boggs for the years 1898 and 1899. On this subject Burns testified as follows:

"Q. If the bond which you and Burton executed October 29th, 1900, had contained a covenant or statement that you, or either of you, would indemnify the American Bonding Company for any liability it might have been under for acts antecedent to December, 1899, would you have signed it? A. I would not under any circumstances. Q. On cross-examination you have been compelled to give your character as a business man. Would you, for the consideration of $100.00 or at any time, undertake a liability which as a business man you would know would certainly amount to $2,000.00 or $2,500.00, for that $100.00, A. Of course not. Q. Did you consciously, at the time of signing this bond, undertake or agree to become bondsman for anything else than the revenue collected for the year of 1900, and that at the time collected and accounted for? A. I did not; only intended to indemnify against the county revenue and state revenue and public assessments for the year 1900. Q. And, as I understand it, your willingness to do that was based upon the contract which had put the affairs of Boggs in Burton's hands and your confidence in the integrity and ability of Burton? A. That is it exactly."

In this connection Burton testified as follows:

KENTUCKY REPORTS [Vol. 182.

"Q. Was anything said in that conversation between you and Mr. Sullivan in the presence of Mr. Abrahams about the fact that Boggs was in arrears for the previous years? A. My recollection is that Mr. Abrahams said that he was afraid that Mr. Boggs would collect the taxes for 1900, and apply them on the previous years, and for that reason it was a desirable thing not to put the 1900 taxes in his hands. . . . Q. Now, after that time was any arrangement made between you and Boggs and the bonding company with reference to the collection of the 1900 taxes? A. Well, the arrangement was that I was to collect the taxes and public dues for the year 1900, and pay them over to the proper authorities. . . . Q. Was it, or not, any part of the agreement between you and the bonding company that you or Mr. Burns should indemnify them for any other amount than the 1900 taxes? A. Only the 1900 taxes. Q. Was anything said by Mr. Abrahams or Mr. Sullivan representing him, that you and Mr. Burns, or that either of you, by signing this paper, would become liable for default or arrears of taxes prior to the year 1900? A. It was not. Q. Would you have signed an agreement or have undertaken to indemnify the bonding company for anything already due from taxes covered by the bonds of the previous years of 1897, 1898 and 1899? A. I would not."

H. C. Sullivan, a lawyer, was the representative in Louisa of the American Bonding & Trust Co. in the matter of its suretyship for Boggs as sheriff. When asked if he understood from anything that was said by Burton or Burns that they were undertaking or intending to do anything else than collect and account for the taxes for 1900, Sullivan testified that he thought Mr. Abrahams understood fully what he was doing, but that he did not believe Burns and Burton understood that they were legally bound except for Burton's acts; and, that while Abrahams might have believed them bound for arrearages in previous years he did not believe that Burton and Burns so understood it. Sullivan further testified that Burns declined to go on Boggs' bond, but that he was willing to go surety upon Burton's bond for the taxes of 1900, and that he did so. And, athough Sullivan testified that he had a suspicion that the bond might be retroactive so as to bind the obligors for previous years, he was not sure that his suspicion was well founded, and

said nothing about it at the time.  Upon this subject Sullivan testified as follows:

"Q. Now, the question is, whether you had that opinion at the time this bond was signed in October or whether it came to you later?  A. I say I was in confusion about it, and I was not certain about it in my mind, at the time the bond was signed by them, but in fact, I did not think it occurred to me, probably only in a dull way, that there was any liability attached at the time these gentlemen signed this bond.  Q. You knew, and Abrahams knew, that Boggs was behind in a considerable amount, between two and three thousand dollars?  A. Yes, sir; we knew he was behind. . . .  Q. At the time of the signing of the bond you did not know what would be the probable effect of it?  A. I did not; I was not positive of it.  Q. Well, you and Abrahams both knew that Boggs was in arrears, did you not?  A. Yes, sir. . . .  Q. Did Mr. Abrahams state to you, or you state to him, before or at the time this bond was signed, that the effect of it would be to put these folks in for the prior defaults of Boggs?  A. No, sir.  Q. Was it discussed between you at the time as to whether it would, or not?  A. It was not.''

The effect of the testimony is that none of the parties was aware of the fact that the sheriff's bond for the year 1900 covered arrearages for previous years; that in making the arrangement which resulted in the execution of the indemnifying bond sued on, all the parties had in mind the single purpose of safeguarding the collection of the taxes for the year 1900; and that the bond was given for that purpose; but in reducing the agreement to writing the parties failed to so limit it, thinking, no doubt, that it was not necessary that it should be expressly limited when it recited the bonds intended to be covered.  This conclusion is emphasized by the fact that the gentlemen's tripartite agreement of October 1st, 1900, makes reference seven times to the collection of the revenues for 1900, and no reference to any other revenues.  Ordinarily a bond has only prospective operation; but this rule has been reversed by the statute which gives a sheriff's bond a retroactive as well as a prospective operation.  In failing to limit the bond so that the indemnitors' liability should be confined to arrearages for the year 1900 the parties, by mutual mistake, failed to

make it express the contract between them. In such cases it is the duty of the chancellor to redraft the written instrument so as to make it conform to the contract between the parties. It will be done in this case and enforced only as reformed. Worley v. Tuggle, 3 Bush 168; Lear v. Prather, 89 Ky. 501; Welch's Admr. v. Welch, 13 R. 639; Logan v. Langan, 145 Ky. 601; McMee v. Henry, 163 Ky. 735; Cecil v. Ky. Live Stock Ins. Co., 165 Ky. 213.

Judgment reversed and action remanded with instructions to enter a judgment dismissing the petition.